## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN LaFAVE, as Personal
Representative for The Estate of                )
ASHLEY LaFAVE, deceased,                         )
                  Plaintiff,            )Case No.:
                                        )Hon.:
                                        ) Mag.:

-vs-                                             )
                                        )

GENESEE COUNTY a political                       )
Subdivision of the State of Michigan;            )
ADVANCED CORRECTIONAL                             )
HEALTHCARE, INC., a foreign                       )
corporation; and JOHN DOE                         )
NURSE,                                           )
joint and severally,                             )
                  Defendants.

## <u>COMPLAINT AND JURY DEMAND</u>

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge, nor do I know of any other civil action, not between these parties, arising out of the same transaction or occurrence as alleged in this complaint that is either pending or was previously filed and dismissed, transferred, or otherwise disposed of after having been assigned to a judge in this court.

## JURISDICTION

1. This is a civil action is brought pursuant to 42 U.S.C. § 1981 *et. seq.* and seeks monetary damages against Defendants for violations 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments to the Constitution of the United States.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

3. Venue is appropriate in this jurisdiction under the provisions of Title 28 U.S.C. § 1391(b), § 1331, and § 1343 and pendant jurisdiction over state claims which arise out of the nucleus of operative facts common to Plaintiffs federal claims.

## PARTIES

4. Plaintiff JOHN LaFAVE is the duly appointed and qualified Personal Representative of the Estate of ASHLEY LaFAVE, deceased.

5. Defendant, GENESEE COUNTY, is a political subdivision of the State of Michigan duly organized to carry out governmental functions pursuant to the law of Michigan, one of the functions being to organize, operate, staff and supervise its detention center known as the GENESEE COUNTY JAIL ("GCJ"), which houses inmates. It is being sued in its official capacity.

6. Defendant ADVANCED CORRECTIONAL HEALTHCARE, INC. ("ACH") is a for-profit foreign corporation licensed to do business in Michigan, with its principal place of business located in the State of Missouri. At all times pertinent hereto, ACH was and is obligated by contract to provide managed healthcare and/or medical care to Genesee County Jail and/or Genesee County Correctional Facility inmates generally, and to Decedent ASHLEY LaFAVE, in particular.

7. Defendant JOHN DOE NURSE, to be named by and through discovery, was a nurse who provided medical services to ASHLEY LaFAVE following ASHLEY LaFAVE'S initial detention. John Doe Nurse is sued in his individual capacity.

8. At all times relevant to the facts giving rise to this Complaint, Defendants, each and all of them, acted under the color and pretense of the statutes, ordinances, regulations, laws, customs, and usages of the State of Michigan, and by virtue of and under the authority of the Defendants' employment with the State of Michigan.

## COMMON ALLEGATIONS

9. As a direct result of Defendants actions and inactions, their policies, procedures, and customs, the mental health needs of detainees at GCJ, including LaFAVE, are routinely ignored.

10. Plaintiff's decedent was a detainee with obvious mental health needs whose cries for help were similarly ignored.

11. Defendants GENESEE COUNTY was responsible for LaFAVE'S death by violating her rights under the 8th and 14th Amendments to the United States Constitution amongst others.

12. The need to reform the jail system, especially in Genesee County, is obvious. Only six percent of U.S. jails reported two or more deaths by any cause in 2011; Eighty-one percent of jails reported no deaths. The same cannot be said for GENESEE COUNTY and its jails.

13. Since 2013 at least three inmates at the GCJ have committed suicide. The need for better training has been obvious yet GENESEE COUNTY has taken no action, failed to increase the frequency of welfare checks, and failed to prevent similar incidents from occurring.

14. On February 8, 2012, Robert Sigler was found unresponsive in his cell after having smashed his head against his cell bars requiring immediate medical

attention. Shortly thereafter, on February 23, 2012, Angela K. Issa was found in her cell unresponsive. Despite these suicide attempts GCJ failed to increase the frequency of welfare checks. Further, GENESEE COUNTY did nothing to reform the jail system and failed to adequately train and supervise its jail staff.

15. Defendant ACH is responsible for PRIMEL'S death as a result of its unconstitutional polices, customs, and practices as set forth herein and including its failure to properly train and supervise its employees to detect if a detainee is receiving inadequate mental health care.

16. Defendants JOHN DOE NURSE are responsible for LaFAVE'S death by violating her rights under the 8th and 14th Amendments to the United States Constitution.

17. Upon information and belief, Defendant ACH is currently responsible for providing daily care for over 33,000 patients, operating in over 300 adult city, county, regional facilities and 13 youth detention centers across 18 states.

18. Upon information and belief, Defendant ACH's business model is to increase the volume of its contracts by underbidding the competition and implementing severe cost control measures, the necessary result is

unnecessary suffering of people detained in jail in which ACH is contracted to provide medical and health care services.

19. Upon information and belief, Defendant ACH's CEO has explained to potential customers that ACH keeps costs to the customers down by reducing visits to hospitals. This, the CEO explained, kept its customers happy and helped ACH increase its profits by allowing it to expand its business.

20. Upon information and belief, Defendant ACH indemnifies it jail-customers, like Genesee County, through substantial insurance coverage, and as a result ACH's customers, including Genesee County, are willing to hire companies like ACH with poor track records in providing appropriate medical care, and they have little financial incentive to address deficiencies in the care provided at the jail.

21. In addition to these financial arrangements, Defendant ACH implements its cost control measures by training its employees to provide less care to detainees and by pressuring those employees to provide less care.

22. Upon information and belief, when Defendant ACH hires a new healthcare practitioner, the practitioner must attend a training session regarding the manner in which to provide medical care to people who are

detained in jail. All new hires across the country are flown to ACH headquarters for this multiple-day training.

23. Upon information and belief, at the outset of the training, ACH trains its medical staff to believe that people who are detained in a jail are different than people in the free world because, whereas people in the free world seek healthcare because they have legitimate needs that require attention, people in jail seek healthcare in order to be comfortable, because they are merely anxious, and for similar trivial and illegitimate reasons.

24. Defendant ACH trains its practitioners to ignore or discount the medical concerns identified by persons in jails as things a person "wants" rather than legitimate medical needs, and its emphasizes that jail is "not a health spa" such that hail staff can ignore many medical concerns raised by detainees house there.

25. Trainings of this sort are repeatedly provided alike to ACH employees and correctional staff at facilities serviced by ACH.

26. In addition to training, ACH and its customers apply pressure on ACH employees-even nominally independent practitioners-to cut back on the quality of care provided to jail detainees if such care is likely to increase outside care of staffing costs.

27. ACH mis-trains its employees, pressuring them not to provide medical are they believe is clinically necessary, and delaying the provision of care and medication in hopes a detainee is transferred out.

28. In this way, Defendant ACH is indifferent and reckless to the danger that its practices will result in substandard or even catastrophic medical care.

29. Turing a blind eye to the inadequate and catastrophic instances of care that often result from its policies and practices allows ACH to continue providing constitutionally inadequate care to the detriment of people who find themselves in detention, like LaFAVE.

30. Defendant ACH has been sued approximately 660 times within the last five years for similar civil rights violations and for its unconstitutional polices, practices, and customs.

31. Further, despite the repeated acts recklessness and/or deliberate indifference by its employees, Defendant ACH did nothing to retrain, remedy, or otherwise address the pervasive unconstitutional conduct of its employees and agents, thereby condoning the unconstitutional conduct of its employees.

32. At all times relevant, it was clearly established that detainees including LaFAVE, had a constitutional right to medical care and treatment for her

serious medical needs such that none of the Defendants are entitled to qualified immunity.

33. On July 1, 2021, Genesee County entered into a contract with ACH to provide for the delivery of reasonably and/or medically necessary health care to individuals under the physical custody and control of the County at the Facility.

34. The contract provides that "All medical services shall be provided in accordance with NCCHC standards, and all applicable administrative rules for the Facility."

**Facts giving rise to Katie Primel death while housed at GCJ**

35. Plaintiff's decedent, LaFAVE, was born on March 20, 1984, and was 42 years old at the time of the alleged event.

36. On or about July 22, 2024, LaFAVE, arrived and was booked into the GCJ.

37. At some point during her incarnation, LaFAVE sent messages in the jail monitored kiosk, advising that she was going to kill herself.

38. Upon information and belief, there were several more messages sent from the kiosk.

39. Accordingly, LaFAVE should have been placed on suicide observation.

40. LaFAVE was never placed on suicide observation as required by ACH's policies.

41. Upon information and belief, prior to her incarceration, LaFAVE was being treated for depression. Despite being treated for depression, she was never placed on suicide watch. In fact, there was never any attempt to address LaFAVE'S serious mental health needs: there was no communication amongst the chain of command indicating that LaFAVE should be placed on suicide watch.

42. On March 7, 2022, PRIMEL was found hanging by a bedsheet in her cell.

43. LaFAVE threat of suicide was never communicated with the shift commander, and LaFAVE was not referred for a mental health evaluation. She was also never placed on a suicide watch.

44. Upon information and belief, when an inmate expresses feelings of hopelessness, this must be reported to the Shift Commander and the inmate must be referred for a mental health evaluation, and the inmate must be placed on suicide watch.

45. Upon information and belief, it was falsely reported that LaFAVE did not have a history of suicidal ideations and that LaFAVE did not have mental health problems.

46. Prior to her death, Defendants were well aware that LaFAVE was at a high risk for suicide yet they failed to take adequate steps to address the risk, including but not limited to proper training, supervision.

47. Defendants ACH, GENESEE COUNTY in fact exacerbated Plaintiffs mental health conditions by mistreatment and disregard for her serious mental health conditions and by dismissing her symptoms of depression.

48. Contrary to GENESEE COUNTY policy, and despite Defendants' knowledge of LaFAVE being a high risk for suicide, LaFAVE was not placed in a cell with proper suicide supervision or precautions.

49. Despite being in this distressed state, Defendants ACH, JOHN DOE NURSE, did not alert mental health professional's or take any steps to evaluate, assess or address the distress LaFAVE was suffering from, despite knowledge of LaFAVE'S high risk of self-harm.

50. LaFAVE exhibited clear intent to engage in self-harm and Defendants, despite their knowledge of her high risk for self-harm, failed to take any steps to prevent her death by suicide, including, but not limited to removing material that was readily available for executing the harm, contacting mental health, placing LaFAVE in an observation area or taking any other septs to prevent the harm.

51. Defendant violated GENESEE COUNTYS policy in failing to perform proper checks/walks for over two hours which would have been effective in preventing LaFAVE'S death by suicide.

52. Specifically, Policy Directive 04.06.183(L), provides: "When a mental health emergency is suspected, custody staff shall place the prisoner in an observation room, or its reasonable equivalent in safety restrictions where an observation room is not available... Necessary precautions shall be taken to prevent him/her from engaging in behavior which is injurious to self, others, or property in accordance with PD 04.05.112. Managing Disruptive Prisoners and PD 04.06.115, Suicide Prevention."

53. Defendants' callous disregard of LaFAVE'S serious medical needs rose to the level of reckless and intentional harm which was the cause of LaFAVE'S self-injurious behavior.

54. LaFAVE'S death is a direct result of Defendants ACH's, explicit disregard of GCJ policies, gross negligence, deliberate indifference, and recklessness to LaFAVE'S health and welfare.

55. The acts and/or omissions of each and all Defendants amount to gross negligence in that Defendants' conduct was so reckless that it demonstrated a substantial lack of concern for whether injury results.

56. Defendants' failure to properly treat LaFAVE mental illness exacerbated her mental difficulties, including her suicidal ideations, and causes her death by suicide.

57. GENESEE COUNTY had a pattern, practice, and custom of permitting jail staff and personnel of GCJ to walk through the unit and perform welfare checks without going inside each cell to see the detainees and without speaking to them to determine if they were properly cared for.

58. Notwithstanding the obvious implications surrounding LaFAVE'S death, and contrary to GENESEE COUNTY'S policies, and as a means to conspire to cover up Defendants' violations of LaFAVE'S constitutional rights, recklessness, deliberate indifference, and its gross negligence, Defendants failed to immediately notify the Michigan State Police of LaFAVE'S suicide so that it could conduct a timely investigation into the circumstances of LaFAVE'S death.

59. The deputies at the GENESEE COUNTY JAIL, including Defendant intentionally engaged in behavior intended to obstruct any subsequent investigation into LaFAVE'S death for the purpose of covering up its misconduct and by failing to preserve critical evidence under its control.

## COUNT-I
## VIOLATION OF 8TH AND 14TH AMENDMENT; DEFENDANT ISREAL

60. The allegations contained in the above paragraphs are hereby incorporated by reference.

61. At all times relevant hereto, LaFAVE, had the right under the federal constitution to receive adequate and timely medical attention under the 8th and 14th Amendments.

62. Defendant Isreal by her acts and/or omissions, violated LaFAVE's constitutional rights under the 8th and 14th amendments in the following ways:

    a. Intentionally, callously, willfully, wantonly or with deliberate indifference and reckless disregard for LaFAVE'S well-being, failed to provide adequate medical/mental attention for LaFAVE'S serious medical/mental health needs;

    b. Failing to take reasonable precautions to protect LaFAVE from the foreseeable risk of suicide by, *inter alia*, failing to perform timely rounds, failing to ensure that LaFAVE received and took her prescribed medications.

63. As a direct and proximate result of Defendant Isreal's unlawful acts as described herein, LaFAVE sustained serious and permanent injuries including death.

## COUNT-II
## <u>CONSTITUTIONAL VIOLATIONS BY GENESEE COUNTY</u>

64. The allegations contained in the above paragraphs are hereby incorporated by reference.

65. Defendant Isreal committed the constitutional violations herein described as a result of the training and/or lack of training by Defendant Genesee County.

66. Defendant Genesee County failed to properly train, monitor, direct, discipline, and supervise its medical staff and deputies and knew or should have known that its staff would engage in the complained of behavior given the pervasive unconstitutional conduct of its staff, and other agents of Genesee County including Defendant ACH and its staff.

67. In all of the aforementioned policies, practices, and customs of Defendant Genesee County, and its failure to properly and adequate train, monitor, instruct, direct, discipline, and supervise the individual Defendants, Defendant Genesee County was reckless and deliberately indifferent to a likelihood that the constitutional rights of the public and particularly of Plaintiff would be violated. To wit, Defendant Genesee County's unconstitutional policies, practices, and customs included:

   a. Failing to properly screen/assess detainees for serious mental health issues including suicide;

   b. Failing to properly render the proper medical attention to a prisoner who was diagnosed and generally recognized as mentally ill;

   c. Failing to properly train correction officers in the evaluation of whether a prisoner needs medical treatment;

d. Failing to provide decedent with appropriate supervision given her medical needs and suicidal ideation;

e. Failing to implement procedures necessary to effectively enforce requirements set forth in GENESEE COUNTY Policy Directive;

f. Failing to properly address decedent's immediate suicide risk, recklessly disregarding decedent's suicidal history and decedent's Mental Health Management Plan;

g. Failing to place decedent in a safe environment so that she could not harm herself;

h. Failure to implement protocols, guidelines or policies regarding timely diagnosis, care and treatment of someone suffering from a mental health crisis;

i. Failure to implement protocols, guidelines or policies requiring supervising nurse on duty to properly assess a patient who is suffering from an obvious mental health crisis;

j. Adopting a policy/custom/ practice of relying upon medically underqualified staff acting as gatekeepers to physicians and other qualified medical providers amounting to deliberate indifference to foreseeable consequences of inadequate access to timely qualified medical judgment;

k. Adopting a policy/custom/ practice of staffing jails primarily with medically underqualified LPNs tasked to evaluate inmates booked with visible signs of a mental health crisis fracture without timely referral to onsite physician or RN supervision during all shifts;

l. Adopting a policy/custom/ practice of withholding or delaying in-person physician evaluation of pretrial detainees/arrestees booked with visible signs of suffering from an obvious mental health crisis;

m. Adopting a policy/custom/ practice of providing cursory care to pretrial detainees/arrestees booked with serious medical and mental health needs, based upon budgetary concerns instead inmate health and safety.

68. Defendant Genesee County adopted, promulgated, encouraged, condoned, and/or tolerated such customs, policies, practices, and/or procedures including the failure to properly staff, screen, train, and/or supervise the conduct described herein, such that same amounted to deliberate indifference to LaFAVE'S serious medical needs in violation of the 8th and 14th amendments.

69. Defendant Genese County's failure to implement adequate policies, customs, procedures relative to the provision of adequate mental health screening and treatment to detainees like LaFAVE violated LaFAVE'S constitutional rights and acted as the moving force of such constitutional violations.

70. As a direct and proximate result of Defendant Genesee County's aforementioned policies, customs, and/or practices, LaFAVE suffered pain, anguish, injuries, and ultimately death.

## COUNT-III
## CONSTITUTIONAL VIOLATIONS BY ACH

71. The allegations contained in the above paragraphs are hereby incorporated by reference.

72. Pursuant to its contract with Defendant Genesee County, Defendant ACH performed a traditional state function of providing medical services to detainees at the GCJ and thus was acting under the color of law.

73. Pursuant to its contract with Defendant Genesee County, Defendant ACH had a duty to promulgate and implement policies, procedures, and customs to provide screen, test, and provide medical care to detainees at the GCJ consistent with the 8th and 14th amendments.

74. Defendant ACH was also in charge of training and hiring of staff members that are responsible for providing mental health and medical care and treatment to the inmates at the GCJ.

75. Defendant ACH knew, or should have known, that detainees were being taken into custody who may suffer from mental health conditions or suicidal tendencies and who were repeatedly committing suicide.

76. Defendant ACH failed to implement policies, practices, and customs to provide adequate medical and mental health care to detainees.  Defendant's policy failures include, to wit:

   a. Failing to properly screen/assess detainees for serious mental health issues including suicide;

   b. Failing to convey to GCJ staff the need to put a detainee on suicide observation and/or suicide prevention protocols;

   c. Failing to properly render the proper medical attention to a prisoner who was diagnosed and generally recognized as mentally ill;

   d. Failing to properly train correction officers in the evaluation of whether a prisoner needs medical treatment;

   e. Failing to provide decedent with appropriate supervision given her medical needs and suicidal ideation;

   f. Failing to implement procedures necessary to effectively enforce requirements set forth in GENESEE COUNTY Policy Directive;

   g. Failing to properly address decedent's immediate suicide risk, recklessly disregarding decedent's suicidal history and decedent's Mental Health Management Plan;

   h. Failing to place decedent in a safe environment so that she could not harm herself.

i.  Failure to implement protocols, guidelines or policies regarding timely diagnosis, care and treatment of someone suffering from a mental health crisis;

j.  Failure to implement protocols, guidelines or policies requiring supervising nurse on duty to properly assess a patient who is suffering from an obvious mental health crisis;

k.  Adopting a policy/custom/ practice of relying upon medically underqualified staff acting as gatekeepers to physicians and other qualified medical providers amounting to deliberate indifference to foreseeable consequences of inadequate access to timely qualified medical judgment;

l.  Adopting a policy/custom/ practice of staffing jails primarily with medically underqualified LPNs tasked to evaluate inmates booked with visible signs of a mental health crisis fracture without timely referral to onsite physician or RN supervision during all shifts;

m. Adopting a policy/custom/ practice of withholding or delaying in-person physician evaluation of pretrial detainees/arrestees booked with visible signs of suffering from an obvious mental health crisis;

  n. Adopting a policy/custom/ practice of providing cursory care to pretrial

   detainees/arrestees booked with serious medical and mental health needs,

   based upon budgetary concerns instead inmate health and safety.

77. Defendant ACH acted recklessly and exhibited deliberate indifference to

LaFAVE'S serious medical needs through its policies, practices and customs,

which was the moving force in the violation of LaFAVE'S clearly established

constitutional rights under the 8th and 14th amendments.

78. Defendant ACH had actual or constructive knowledge of the unreasonable risk

to inmate health and safety due to the longstanding deficient practices, customs

and policies previously enumerated which created a clear and persistent pattern

of constitutional violation but despite said knowledge Defendant ACH failed to

take reasonable steps to abate the unreasonable risk to inmate health or safety

which was the moving force behind the constitutional violations sustained by

LaFAVE.

79. Prior to the date of LaFAVE'S incarceration, Defendant ACH had been sued

and/or notified multiple times of the clear and persistent pattern of similar

constitutional violations based upon deliberate indifference to the serious

medical needs of inmates due to lack of protocols, policies and practices

regarding the serious nature of mental health treatment. The multiple lawsuits

and complaints and investigations informed ACH of deficient policies and

procedures, including but not limited to unreasonable denial and delay of reasonable access to qualified professional judgment, unreasonable delay or denial of care that is ordered for serious medical conditions, including a patient suffering from an obvious mental health crisis.

80. Defendant ACH further failed to provide adequate training to their employees, including Defendant JOHN DOE NURSE, to reasonably provide for the safety and health of inmates with such mental health conditions or self-destructive or suicidal tendencies by failing to properly access the level of care needed, failing to determine if the patient exhibits suicidal or homicidal ideations, and failing to properly assess the patient's mental health needs.

81. The facts available to Defendants ACH, and JOHN DOE NURSE, as asserted herein, put them on actual or constructive notice that their acts and omissions were substantially certain to result in the violation of LaFAVE'S constitutional rights.

82. Defendants further knew, or should have known, that PRIMEL had a history of suicide given that she had expressed a desire prior to her death.

83. Defendant ACH's employees were so inadequately trained that she failed to place LaFAVE on suicide observation watch and failed to advise staff at the GCJ that LaFAVE was a suicide risk.

84. Further, for a period of five (5) months Defendants ACH and Defendant John Doe Nurse failed to and/or delayed needed medication and/or treatment for LaFAVE'S serious medical/mental health needs which resulted in LaFAVE'S death.

85. Despite LaFAVE'S prior suicide attempts, Defendant ACH and its staff, Defendant John Doe Nurse simply dismissed LaFAVE'S serious mental health needs.

86. Defendant ACH adopted, promulgated, encouraged, condoned, and/or tolerated such customs, policies, practices, and/or procedures including the failure to properly staff, screen, train, and/or supervise the conduct described herein, such that same amounted to deliberate indifference to LaFAVE'S serious medical needs.

87. Defendant ACH's failure to implement adequate policies, customs, procedures relative to the provision of adequate mental health screening and treatment to detainees like LaFAVE violated LaFAVE'S constitutional rights and acted as the moving force of such constitutional violations.

88. Defendant ACH trained their officials and/or employees and agents in such a reckless and deliberately indifferent manner, that it was inevitable that its staff and/or agents would fail to properly assess the needs of an individual, like LaFAVE, suffering from a serious mental health crisis.

89. Notwithstanding LaFAVE contemplation of suicide, Defendant repeated and acquiesced in the continued practice of not placing potentially suicidal prisoners, such as LaFAVE, under close supervision and acquiesced in the repeated continued practice of not adequately assessing suicidal inmates in obvious need of mental health treatment.

90. The failure of Defendant to provide training and supervision regarding the prevention of suicides eventually lead to LaFAVE death by suicide.

91. Defendant ACH had actual and subjective knowledge of LaFAVE serious medical needs as observed, documented and manifested by symptoms so obvious that even a layperson would easily recognize the necessity for a doctor's attention, of which Defendant ACH exhibited deliberate indifference by a complete failure to render even basic care instead providing grossly inadequate care in violation of clearly established constitutional rights.

92. Had this Defendant implemented adequate suicide precautions, a different outcome with respect to LaFAVE medical care and supervision would have resulted.

93. Despite possessing the authority and means to remedy the unconstitutional treatment of LaFAVE, ACH was deliberately indifferent to their inadequate suicide precautions and knowingly and recklessly failed to take action to

provide sufficient welfare checks, which would have ensured LaFAVE safety and prevented her death.

94. As a direct and proximate result of ACH's inadequate suicide precautions, Defendant's failure to properly train its employees, and as a result of the breach of the duties set forth herein, LaFAVE suffered pain, anguish, injuries, and ultimately death.

## COUNT-IV
## VIOLATION OF 8TH AND 14TH AMENDMENT;
## DEFENDANTS JOHN DOE NURSE

95. The allegations contained in the above paragraphs are hereby incorporated by reference.

96. Defendants John Doe Nurse were both required to properly assess, monitor, and provide treatment to LaFAVE consistent with the 8th and 14th amendments to the constitution.

97. Defendants John doe Nurse knew, or should have known, of LaFAVE'S serious medical needs including to prevent her foreseeable death by suicide.

98. Despite LaFAVE'S prior attempts at suicide, Defendants JOHN DOE NURSE failed to properly screen, assess, convey to GCJ jail staff, and further monitor LaFAVE'S need for medical and mental health treatment for her serious medical needs.

99. Defendants JOHN DOE NURSE simply dismissed LaFAVE'S serious mental health needs. These Defendants further failed to review LaFAVE'S complete medical file to determine the type of care and treatment she required.

100. By ignoring LaFAVE'S serious medical and mental health needs, Defendants JOHN DOE NURSE acted recklessly and with deliberate indifference to LaFAVE'S safety in violation of the 8th and 14th amendments.

101. Defendants JOHN DOE NURSE had actual and subjective knowledge of LaFAVE'S serious medical needs as observed, documented and manifested by symptoms so obvious that even a layperson would easily recognize the necessity for a doctor's attention, of which these Defendants exhibited deliberate indifference by a complete failure to render even basic care instead providing grossly inadequate care in violation of clearly established constitutional rights.

102. Had these Defendants implemented adequate suicide precautions, a different outcome with respect to LaFAVE medical care and supervision would have resulted.

103. Despite possessing the authority and means to remedy the unconstitutional treatment of LaFAVE, Defendants JOHN DOE NURSE were deliberately indifferent to their inadequate suicide precautions and knowingly and

recklessly failed to take action to provide sufficient welfare checks, which would have ensured LaFAVE'S safety and prevented her death.

104. As a direct and proximate result of Defendants JOHN DOE NURSE's acts and/or omissions, LaFAVE'S suffered pain, anguish, injury and death.

## RELIEF REQUESTED AS TO EACH AND ALL COUNTS

**WHEREFORE,** Plaintiff, **JOHN LaFAVE,** as Personal Representative of the Estate of Katie Nichole Primel, deceased, respectfully requests this Honorable Court enter Judgment in her favor and against Defendants jointly and severally, an amount in excess of $75,000, and grant the following non-exhaustive list of relief:

    a.    Conscious pain and suffering between the time of his injury and death;

    b.    Loss of financial support;

    c.    Loss of service;

    d.    Loss of gifts or other valuable gratuities;

    e.    Loss of comfort, society and companionship;

    f.    Compensatory and punitive damages; and

g.    Any and all other damages otherwise recoverable under 28 U.S.C. §§ 1983 and 1988.

Date: July 31, 2026               Respectfully Submitted,

PREMIER LEGAL GROUP, PLLC

**JERARD M. SCANLAND (P74992)**
Attorney for Plaintiff
13351 Reeck Court, Suite 5
Southgate, Michigan 48195
Telephone: (734)-282-6037
Facsimile: (734)-447-5837
JScanland@milawoffices.com